**Fermon DURHAM, Administrator of the Estate of Larry W. Durham, Appellant,**

v.

**COMMONWEALTH of Kentucky et al., Appellees.**

Court of Appeals of Kentucky.

Oct. 7, 1966.

Charles Allen Williams, Paducah, for appellant.

Robert Matthews, Atty. Gen., John B. Browning, Frankfort, for appellees.

HILL, Judge.

As administrator of the estate of his son, Larry W. Durham, appellant commenced this proceeding by authority of Chapter 44 of Kentucky Revised Statutes by filing before the Board of Claims a complaint asking damages against the Board of Regents of Murray State College and the Commonwealth of Kentucky, in which it was claimed the defendants negligently caused the death of his son Larry, a student at the college. The Board of Claims disallowed appellant's claim. An appeal to circuit court re-

sulted in a judgment affirming the order of the Board of Claims. This appeal followed.

Around five o'clock on the afternoon of November 13, 1961, Larry W. Durham was discovered lying limp on the bottom of the deep end of the indoor swimming pool of the college. There were about thirty-five other people in and about the pool. Lifeguard James Hawley was on duty at the time. The first information the lifeguard had of the distress of Larry was when Robert Harry reported a "body on the bottom." Robert dived into the pool and came up with Larry. The lifeguard testified he also went into the pool and assisted Harry and others in getting Larry onto the deck. In so doing, Larry's head was allowed to "slap" against the side of the pool or deck. When Larry was turned over preparatory to the administration of artificial respiration, it was noticed that his ear and nose were bleeding. The Board of Claims found that the "probable cause of death" was "the blow on the head that the decedent received after being lifted out of the pool onto the tile or concrete deck." Appellant admits in one breath that "the cause of death so far as this appeal is concerned" is limited to what occurred at the time Larry was removed from the pool. Yet, near the conclusion of appellant's brief, it is stated: "We think that the failure on the part of the lifeguard to pay attention to his duties resulted in Durham being at the bottom of the pool in the first place * * *."

Although the Board of Claims' judgment may technically limit the scope of our review to a determination of the question of negligence after or at the time of the removal of Larry from the pool, we are inclined to examine the facts to determine whether there was conclusive evidence of negligence on the part of the lifguard before Larry was removed from the water.

The lifeguard knew Larry was a poor swimmer accustomed to using the shallow end of the pool. He also saw Larry standing on the deck at the deep end talking with two girls. There is some evidence the life-guard was engaged in a conversation with some bystanders about the time Harry reported the "body on the bottom" of the pool. But, there was no evidence of Larry or anyone else being reckless or engaging in "horseplay" or that anything else occurred before the discovery of Larry "on the bottom" sufficient to attract the attention of the lifeguard or any one of the thirty-odd other persons in the pool.

Notwithstanding the finding of the Board of Claims that the proximate cause of Larry's death was the injury received while being removed from the water, it seems strange and mysterious that he could have slipped into the pool uninjured and unnoticed and not "come up" a time or two for "help." There is no evidence of the manner in which Larry came to be in the pool or how long he remained there. There is no evidence of his breathing or having any pulse after he was removed from the water.

We quote from the testimony of the doctor who performed the autopsy:

"* * * and found a fracture line·running across the temporal parietal bone for approximately two to two and a half inches. I turned my skull flap in this area making my skull burr below and above the fracture line and rectangle in the area with my saw in order to expose the membranes beneath. When I turned my front flap to square my rectangle and lifted the portion of bone I was thus removing free blood poured from this area. Free blood will not pour from a turned flap unless there is a recent hemorrhage area beneath. In fact, I would say there was enough blood that I had to take time out and wipe my glasses and, continuing the turning of my skull flap, we found that on the dural surface, that membrane covering the brain, between it and the skull was a large pool of blood from a ruptured vessel."

It is difficult to understand how so much hemorrhaging could have occurred

after removal from the water without evidence of heart beat or breathing. In any event, we conclude from the record before the Board of Claims that there was not sufficient evidence of negligence before removal from the pool to force a judgment allowing the claim.

Proceeding now to the hypothesis outlined by the Board of Claims to the effect that "probable cause of death was the blow on the head of decedent received after being lifted out of the pool onto the tile or concrete deck," we examine the record to determine whether there was actionable negligence on the part of appellee or its employees.

The lifeguard on duty was duly certified by the American Red Cross and held a Red Cross Senior Lifesaving Badge. He was experienced. He joined in the removal of appellant's decedent from the pool at the time or shortly before decedent was lifted out of the water. Four student swimmers were in the process of lifting decedent from the pool when the lifeguard joined them. Of these four student swimmers, three had previous lifesaving experience. Two of them had senior lifesaving ratings. One of them, Robert Harry, who first discovered decedent on the bottom of the pool, stated: " * * * and we were sort of panicky and when we pulled him up each of us had a leg or hand or something and nobody had his head and his head was loose and just slapped the floor * * *."

Under circumstances similar to those found in this case, time is of the essence. Every man participating was rushing every effort to get decedent onto the deck so artificial respiration could be commenced.

■ Assuming there was some "panic" or even carelessness on the part of the four student swimmers undertaking the removal of decedent from the pool, when the lifeguard joined them it cannot be said that the failure of the lifeguard to quell the panic and initiate a better plan of removal constituted actionable negligence under the

circumstances. The Board of Claims found there was no negligence.

■ Our conclusion is that "the evidence of the claim was not so clear-cut and convincing that we could justifiably conclude that the Board acted erroneously as a matter of law" in disallowing the claim. See Lee v. International Harvester Company, Ky., 373 S.W.2d 418, 421 (1963).

The judgment is affirmed.